DENNIS R. BAGNERIS, SR., Judge.
1 plaintiffs, Henry and Gloria Provosty (“Plaintiffs”), appeal a March 13, 2012 judgment of the trial court, which granted defendant, Icehouse Capital Management, LLC (“Icehouse”), a new trial, reduced an emotional and mental anguish award in favor of Plaintiffs from the amount of $300,000.00 to $10,000.00 per plaintiff, denied Plaintiffs’ motion for new trial on the issue of attorney’s fees, and denied the parties sanctions. Defendants, Icehouse, Errol Glasser, and Kestenbaum & Associates, LLC (“Kestenbaum”), answered the appeal. For the following reasons, we hereby reverse that part of the judgment which granted defendant Icehouse’s JNOV and reduced Plaintiffs’ emotional and mental anguish award from $300,000.00 to $10,000.00 each, we reinstate the jury’s award of $300,000.00 for emotional and mental anguish, and we affirm the judgment of the trial court in all other respects.
FACTS AND PROCEDURAL HISTORY
ARC Construction LLC (“ARC-LA”) was formed in Louisiana by individuals and entities from Missouri and New York to do construction work after Hurricane Katrina. The members of ARC-LA were the four principals of ^American Restoration Contractors, LLC, which was a Missouri construction company (“ARC-MO”), the principals of which are defendants, Hyun Sung, Christopher P. Schmitt, Jam-ey Schmitt, Richard Drevet, and the three New York defendants, which are Icehouse, Errol Glasser, and Kestenbaum. Following Hurricane Katrina, in December 2006, the Plaintiffs entered into a construction contract[1] with ARC-LA to construct a new house for them for $607,693.10. After multiple problems, delays and disputes regarding the construction of the home, *27 Plaintiffs filed suit on April 3, 2008, against ARC-MO, ARC-LA and all of its members for negligence, breach of contract, misrepresentation, misappropriation of funds, and fraud. Plaintiffs also sued two employees of ARC-MO, Matt LaMora and Beau Welch. Plaintiffs later filed two amended petitions seeking to hold all the defendants liable under the “piercing the corporate veil/alter ego” doctrine on the basis of fraud and undercapitalization.
On September 29, 2008, defendants ARC-LA, ARC-MO, Mr. Schmitt, and Mr. Drevet filed a reconventional demand against Plaintiffs for legal malpractice as Henry Provosty was ARC-LA’s attorney at the time it began doing business in Louisiana.
A week-long jury trial began on January 31, 2011. After the presentation of Plaintiffs’ entire case in chief, the trial court dismissed defendant Kestenbaum on directed verdict.[2] Afterwards, the trial continued against the other defendants, and on February 7, 2011, the jury verdict awarded Plaintiffs $213,984.16 for out-of-pocket costs and expenses to complete construction of the house, plus $25,000.00 |sfor additional rental, insurance, transportation and inconvenience costs. The jury also awarded $300,000.00 for emotional and mental anguish.
Thereafter, Plaintiffs submitted a proposed judgment[3] purporting to hold all members of ARC-LA solidarity liable, including Kestenbaum (who had been dismissed on a directed verdict) and Mr. Glasser, who the jury exonerated. On March 1, 2011, the New York defendants, Icehouse, Errol Glasser, and Kestenbaum, filed a memorandum in opposition to Plaintiffs’ proposed judgment arguing, among other things, that Mr. Glasser and Kes-tenbaum should be removed from the proposed judgment because there was nothing to support a judgment against either of them. On April 28, 2011, at a hearing on Plaintiffs’ motion for attorney’s fees and costs, the trial court addressed the issue of Mr. Glasser’s and Kestenbaum’s liability and found that Kestenbaum had already been involuntarily dismissed from the case and that the jury did not find that Mr. Glasser had committed fraud. However, the trial court queried whether the jury should have been asked whether Mr. Glas-ser was aware of the fraud that the jury found was committed by other members. Specifically, the trial court stated:
Number 2, on Mr. Glasser, the jury found that there was no fraud. But, Mr. Marx, you brought to the Court’s attention that the interrogatory on 15A on the jury verdict, we didn’t ask specifically did Mr. Winthrop or did Mr. Glasser have knowledge. And so the Court believes that that interrogatory is flawed. What I would ask is that there are two things — one of two things we can do. We can either leave it and let you take it up, or we can have a new trial on just that issue alone — on Mr. Glasser, whether or not he knew or had knowledge of the fraud in order to pierce the corporate veil.
|4So, I mean, I know that’s kind of thrown at you. So you can think about it for a moment and let me know, be *28 cause otherwise that’s where the Court’s going. Because I do believe that 15A is flawed.
In response, counsel for Mr. Glasser [Mr. Marx] wrote a letter to the Court pointing out that the jury had exonerated Mr. Glasser and that he was not liable under any theory of law.[4]
On June 23, 2011, the trial court rendered a final judgment awarding Plaintiffs $213,984.16 for out-of-pocket costs and expenses to complete construction of the house, $25,000.00 for additional rental, insurance, transportation and inconvenience costs, $300,000.00 for emotional and mental anguish, and $314,014.56 for attorney’s fees, costs and expenses, which amounted to an $852,998.72 award. Further, the June 23, 2011 judgment dismissed Kes-tenbaum and Mr. Glasser[5] with prejudice.
On June 30, 2011, the Defendants in Reconvention [Plaintiffs] filed a motion to amend, alternatively a motion for new trial, regarding the June 23, 2011 judgment to reflect the jury’s verdict of no liability with regard to the Plaintiffs-in-Reconven-tions’ legal malpractice claim. Additionally, the Provostys requested the trial court amend its June 23, 2011 judgment to include costs incurred in defending the legal malpractice claim.
On July 5, 2011, Icehouse filed a motion to amend the judgment, for a judgment notwithstanding the verdict (“JNOV”), and/or new trial. In its | ¿memorandum to the court, Icehouse requested a change in the phraseology of the judgment to delete the words “through its Managing Member Marc Winthrop” to clarify that the judgment is against Icehouse as Marc Winthrop was not a party in this matter. Icehouse further requested a JNOV regarding it as a member of ARC-MO. Specifically, Icehouse alleged that the trial court, as well as all counsel, were aware prior to the jury questionnaire being given to the jury that question no. 14 of the jury questionnaire mistakenly ended up including Icehouse as a member of ARC-MO. Icehouse requested that the trial court render a JNOV to acknowledge that Icehouse was not a member of the ARC-MO.
Icehouse also argued in its motion that the evidence does not support a finding of fraud against it and that a JNOV should be rendered, and that the evidence does not support the $300,000.00 award for emotional and mental anguish. Specifically, Icehouse argued that the jury’s erroneous conclusion that Icehouse was a member of the ARC-MO suggests that there was jury confusion about its status and role. Icehouse alleged that it had no involvement with the construction job, and it had no interactions with the Plaintiffs; rather, it, along with two other New York investors, merely invested a half million dollars into the company, which they lost.
In regard to the award for emotional and mental anguish, Icehouse argued that although there was testimony about frustration, anxiety and anger over the eon- *29 struction of the house, the Plaintiffs failed to prove a diagnosed medical condition or emotional injury distinct from that suffered by many following Hurricane Katrina to warrant an award for emotional and mental anguish over |fi$25,000. In conclusion, Icehouse requested a JNOV and/or new trial regarding (1) an amendment of the judgment to delete the words “through its Managing Member Marc Winthrop;” (2) it being mistakenly found to be a member of ARC-MO; (3) it being held liable for fraud; and (4) eliminating or reducing the jury’s award of $300,000.00 for emotional and mental anguish.
Also on July 5, 2011, Plaintiffs filed “a motion for new trial on the specific issues of the award of attorney’s fees, discovery costs, sanctions, legal interest and ongoing attorney’s fees.”
On July 22, 2011, the trial court amended its judgment to include the disposition of the legal malpractice claim against defendant-in-reconvention, Henry Provosty, which was inadvertently omitted from the original June 23, 2011 judgment. The June 23, 2011 judgment was only amended to include $5,738.15 for attorney’s fees, costs and expenses incurred pursuant to defending Henry Provosty against a claim of legal malpractice, which changed Plaintiffs’ total award from $852,998.72 to $858,736.87.
Because of the trial court’s issuance of the July 22, 2011 amended judgment, Plaintiffs, on August 3, 2011, again filed a “motion for new trial on the specific issues of the award of attorney’s fees, discovery costs, sanctions, legal interest and ongoing attorney’s fees,” and adopted and reincorporated the memorandum in supports of its Motion for new trial filed on July 5, 2011.
Following a hearing on various rules and sanctions on October 6, 2011,[6] the trial court signed a judgment on March 13, 2012, finding as follows:
JOINT STIPULATIONS AFFECTING FINAL JUDGMENT
l7The parties jointly agreed/stipulated that: (1) the final judgment should be modified to include judicial interest on the principal award from the date of judicial demand and judicial interest on attorney’s fees and costs from the date of the original final judgment; and (2) Section 9 of the final judgment should be modified to delete all references to Ice House [sic] Capital Management, L.L.C. and Errol Glasser, as they were not members of ARC-Missouri.
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the final judgment in this case will include judicial interest on the principal award from the date of judicial demand and judicial interest on attorney’s fees and costs from the date of the original final judgment.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Section 9 of the final judgment should be modified to delete all references to Ice House [sic] Capital Management, L.L.C. and Errol Glasser, as they were not members of ARC-Missouri.
[[Image here]]
Motion to Correct Party Name in Final Judgment[7]
*30 Mr. [Stephen DJ Marx submitted a motion requesting that all occurrences of the phrase “Icehouse Capital, L.L.C., through its Managing Member Marc Winthrop” in the final judgment of this case be changed to Icehouse Capital Management, L.L.C., through its Managing Member Marc Winthrop”, as this is the correct name of the limited liability corporation. This motion was unopposed.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all occurrences of the phrase “Icehouse Capital, L.L.C, through its Managing Member Marc Winthrop” in the final judgment of this case be changed to Icehouse Capital Management, L.L.C., through its Managing Member Marc Winthrop”.
[[Image here]]
| ¡¿Motion to Correctly List Members of ARC-Missouri
Mr. Marx also submitted a motion requesting Icehouse Capital Management, L.L.C. be removed from the list of members of ARC-Missouri in the final judgment, as Icehouse Capital Management, L.L.C. is, and has never been, a member of ARC-Missouri. This motion was unopposed.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Ice-house Capital Management, L.L.C. will be removed from the list of members of ARC-Missouri in the final judgment.
[[Image here]]
Motion for JNOY or a New Trial for Fraud
Mr. Marx’s third motion sought a j .n.o.v. or in the alternative, a new trial regarding the jury’s finding of fraud on the part of Icehouse Capital Management, L.L.C. Given the jury’s confusion as to whether Icehouse Capital Management, L.L.C. was or was not a member of ARC-Missouri [sic]. Given [sic] the incorrect jury instruction and the high potential for jury confusion, a new trial was granted.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Ice-house Capital Management, L.L.C. will be given a new trial with respect to the alleged fraud it committed against the plaintiffs. This trial must be scheduled for a future date amenable to all parties.
* ⅛ ⅝
Motion for JNOV or a New Trial for Emotional and Mental Anguish
Mr. Marx’s final motion sought a j.n.o.v. or in the alterative, a new trial regarding the jury’s award of emotional and mental anguish. Defendant’s Counsel urged the court to consider the quan-tums in three cases: (1) Kemper v. Coleman, 746 So.2d 11 [ (La.App. 2 Cir.1999) ]; (2) Hardy v. Poydras Properties, 737 So.2d 793 [(La.App. 4 Cir.1999) ]; and (3) Heath v. Brandon Homes, 825 So.2d 1262 [ (La.App. 2 Cir.2002) ]. The last case is from 2002, and the Second Circuit Court of Appeals awarded a husband and wife team $10,000 for mental anguish. A |9review of quantum amounts shows this figure to be around the average.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that a j.n.o.v. on the quantum for emotional and mental anguish is hereby granted. Mr. and Mrs. Provosty shall receive $10,000 each, and the previous award of $300,000 is vacated.
[[Image here]]
*31 Motion for New Trial for Sanctions and Attorney’s Fees
Plaintiffs sought a new trial for sanctions and attorney’s fees. The motion was oddly titled, as neither side had been sanctioned, although the matter of attorney’s fees had been heard. New testimony was submitted by both sides.
Mr. D’Arcy testified about the discovery performed in New York for the Plaintiffs. Mr. Louis DeLong testified as the Plaintiffs expert witness on e-discovery. Mr. Errol Glasser testified about the discovery performed, the availability of the Defendant’s local expert, and the physical conditions and environment of the Defendant’s office in New York. Finally, Dr. Johnette Hassell testified as the Defendant’s expert witness on e-discovery.
After weighing the evidence, the court declines to grant a new trial on the issue of attorney’s fees. The matter of sanctions was more complicated, but after listening to all testimony, and considering both the credibility and competence of all the witnesses, the court finds that there were several misunderstandings between both sides as well as behavior that certainly could have been more professional (but possibly resulted from “culture shock”). None of the misunderstandings or poor behavior rise to the sanctionable level, however.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the court declines to grant a jnov or a new trial in the matter of attorney’s fees.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the court declines sanction [sic] either side.
|inPlaintiffs now appeal this March 13, 2012 judgment, alleging the following assignments of error: (1) the trial court erred by sua sponte granting a JNOV on the issue of Errol Glasser’s liability; (2) the trial court erred by excluding testimony as to future damages and by not allowing the jury to award future damages; (3) the trial court erred by not granting all attorney’s fees and costs; (4) the trial court erred by not sanctioning the defendants; (5) the trial court erred by granting Icehouse’s motion for JNOV and lowering the jury’s award of emotional damages; and (6) the trial court erred by granting a directed verdict in favor of Kestenbaum.
On July 23, 2012, defendants Icehouse and Mr. Glasser answered Plaintiffs’ appeal and argued that: (1) the jury erred in determining that the corporate veil of ARC-LA should be pierced; (2) the trial court erred in not granting the Motion for a JNOV filed by Icehouse relating to the jury’s findings that it committed fraud and violated Louisiana’s Unfair Trade Practices Act; (3) alternatively, if the Plaintiffs/Appellants appeal the decision of the Trial Court to grant Icehouse a new trial, and if this Court reverses that decision but does not find that the trial court erred in failing to grant Icehouse’s Motion for a JNOV, then Icehouse appeals the jury’s finding that it defrauded the Plaintiffs or violated Louisiana’s Unfair Trade Practices Act; and (4) the trial court erred in not awarding attorney’s fees to Icehouse and Errol Glasser in connection with the Plaintiffs’ electronic discovery tactics.
On July 24, 2012, defendant Kestenbaum answered Plaintiffs’ appeal arguing that even though the March 13, 2012 judgment does not directly appeal any claim or cause by Plaintiffs against Kestenbaum, it nonetheless argues (1) that the directed verdict was proper and should be affirmed; (2) Plaintiffs cannot pierce |nthe company veil and attach liability to Kestenbaum because they failed to prove Kestenbaum was the “alter ego” of ARC-LA; and (3) Plaintiffs waived their appeal relating to piercing the company veil against Kestenbaum when *32 they failed to object to the jury instructions and interrogatories which specifically excluded Kestenbaum.
DISCUSSION
Before addressing the merits of the appeal, we first address whether the six issues presented in Plaintiffs’ appeal are properly before this Court. Defendants Icehouse, Mr. Glasser, and Kestenbaum argue that because Plaintiffs only appealed the March 13, 2012 judgment, the only issues properly before this Court are (1) whether the trial court erred by not granting the Plaintiffs’ attorney’s fees and costs, (2) whether the trial court erred by not sanctioning the defendants; and (3) whether the trial court erred by granting a JNOV and lowering the jury’s award of emotional damages. Defendants argue that because Plaintiffs failed to timely appeal the June 23, 2011 and July 23, 2011 judgments, the issues relating to Mr. Glas-ser and Kestenbaum’s JNOV, as well as the issue regarding future damages, are final.
We find no merit in defendants’ argument. Rather, we find that the only final judgment rendered in this case was the March 13, 2012 judgment. By operation of law, La. C.C.P. art.1971 made each of the earlier judgments non appealable. See, e.g. La. C.C.P. arts.1915 and 2123; State, Dept. of Transp. & Dev. v. Triangle Property, LLC, 12-564 (La.App. 3 Cir. 11/7/12), - So.3d -, 2012 WL 5417360. Thus, as long as a viable motion for new trial or motion for JNOV could be filed, the appeal period never commenced. Accordingly, all of Plaintiffs’ assignments of error are properly before this Court.
|12Issue One: Mr. Errol Glasser’s Liability
On appeal, Plaintiffs argue that the trial court improperly removed Mr. Glasser from the judgment despite the jury finding him liable. Mr. Glasser argues that the jury did not find him liable and that the trial court merely entered a judgment in accordance with the jury verdict, which found Mr. Glasser neither committed fraud nor was aware of the fraud. After reviewing the evidence in the record, as well as the relevant case law, we find no error in the trial court’s judgment to dismiss Mr. Glasser with prejudice. Further, we find the trial court’s lengthy analysis regarding Mr. Glasser’s liability in her reasons for judgment to be accurate and worth reiterating. Specifically, the trial court stated as follows:
The most complicated of matters presented to this Court is how to interpret the Jury’s verdict as to Errol Glasser. Plaintiffs’ attempt to include Glasser in the judgment holds more credence as the Jury Vex*dict form is somewhat vague as to what actually occurred concerning Glasser. “If the trial court submits a verdict form to the jury with misleading or confusing interrogatories, just as when it omits to instruct the jury on any applicable essential legal principles, such interrogatories do not adequately set forth the issues to be decided by the jury and may constitute reversible error.” Doyle v. Picadilly Cafeterias, 576 So.2d 1143, 1153 (La.App. 3 Cir.1991).
Before beginning the core analysis as to the problem, plaintiffs attempt to argue that the jury determined that Glas-ser defrauded the Provostys by answering Interrogatory # 12, which stated as follows:
Do you find that the members of ARC-LA acted together in defrauding the Provostys? Yes.
However, Interrogatory # 12 must be read in concert with Interrogatory # 11(e), which stated:
With respect to the fraud committed by the members, managei’S or agents *33 of ARC-LA, do you find that ... Errol Glasser defrauded the Provostys? No.
l1sTo hold that Glasser was found liable for fraud goes directly against the jury’s verdict and any argument to the contrary is without merit.
Concerning the task at hand, there are two specific problems with the Jury Verdict form. The first is in regards to Instruction # 15, which stated the following:
With Respect to ARC-LA, do you find that evidence has been presented that would disregard the corporate veil of [sic] under an “alter ego” theory as regarding the following:
ARC LA? Yes X_ No_
Concerning this Interrogatory, the Jury was instructed in Charge #26 that “If you find evidence that the members of ARC-LA and/or ARC Missouri treated the LLC as their ‘alter ego,’ you may disregard the veil of ARC-LA and/or ARC Missouri and hold the members personally liable.” The problem with this instruction is apparent to this Court after several rounds of motion practice in that the Verdict Form never asks which members disregarded the corporate entity. Plaintiffs attempt to argue that the verdict form is harmonious with the instructions, but the problem with this logic is that the instructions of law concerning Charge #26 as well as Interrogatory# 15 were not clear in allowing the jury to state its answer concerning this finding of fact. Plaintiffs (even if unintentionally) advance the argument that if any member of a corporation is held liable for the failure to follow the five non-exclusive factors required to disregard the corporate veil, then all stockholders in any corporation or LLC can be held liable even when all they did was invest money into such entity. Such a viewpoint cannot possibly be entertained. The actual test in applying the factors is that the analysis must be applied individually to each shareholder to determine if the veil should be pierced as to that shareholder. This analysis is supported by Sea Tang Fisheries, Inc. v. You’ll See Sea Foods, Inc., 569 So.2d 992, 995 (La.App. 1 Cir.1990) and Riggins v. Dixie Shoring Co., Inc., 577 So.2d 1060 (La.App. 4 Cir.1991).
In Sea Tang, the trial court held that two of the three owners of the defendant’s corporation could not be held personally liable by disregarding the corporate entity. While an appeal was not lodged against the two | ushareholders who were dismissed from Judgment, the Second Circuit was compelled to quote the portion of the Judgment dismissing the two stockholders as follows:
This brings us to what the Court considers to be the core issue in the entire case, that is, the attempt to pierce the corporate veil against the stockholders of You’ll See Sea Foods, Inc.
With regard to Herman Riviere [sic] and Aline Daigle, their interest in the corporation was small, and they were not involved in day-to-day affairs of the corporation. The Court finds the evidence simply insufficient to pierce the corporate veil as to them.
Mr. Hayward, on the other hand, was You’ll See Sea Food. The corporation was undercapitalized. Mr. Hayward continuously advanced money to the corporation. Mr. Hayward was the major stockholder in the corporation. He was its chief executive officer, chairman of the board and president. The debts of Mr. Hayward were paid by the corporation in preference to the corporation’s other creditors. The Court is satisfied that the corporation *34 was the alter ego of Mr. Hayward. Therefore, the Court will pierce the corporate veil and render judgment against Mr. Hayward personally.
A similar scenario occurred in Rig-gins, as the trial court dismissed a minority shareholder under an alter ego veil piercing theory and no appeal from that portion of the Judgment was taken. However, this Court agrees with Glas-ser’s position that the Fourth Circuit, if it is required to rule upon the issue, would hold that the alter ego theory must be applied to each member of the corporate entity individually. In Rig-gins, Plaintiffs brought an action against defendant alleging damages the company caused to its home when leveling off the property. When the original defendant Dixie Shoring went bankrupt, the plaintiffs amended their petition to bring personal actions against both the majority and minority shareholder of the business. The trial court dismissed the action against the minority shareholder and held that the majority | ^shareholders could be held personally liable under the five prong analysis of the alter ego theory.
These are two separate appeals where neither plaintiff went after the dismissed party. While there are several factors that go into whether or not to challenge a decision on appeal, the fact that neither plaintiff appealed the decision makes sense if the factors are to be applied individually. To hold that the jury found that the veil was pierced as to Glasser is an argument that cannot be ascertained since the question was never asked. The bottom line is that the jury should have been asked the question.
The second problem involves the failure to place on the jury verdict form an interrogatory questioning whether Glas-ser knew of the fraud perpetrated upon the plaintiffs under the rationale of Bossier Millwork & Supply Co. v. D. & R. Const. Co., 245 So.2d 414 (La.App. 2 Cir.1971). Plaintiffs contend that the jury found that this was a closely held corporation and that all of the members either committed the fraud or knew of the other members’ fraud. While such a contention is a possibility, Glasser was not found liable for fraud and further operates over a thousand miles away in New York. To assume that the jury found that Glasser knew of the fraud is speculative at best.
The ultimate question for this Court is how to fix the problem. This Court at the last hearing asked defense counsel for Errol Glasser whether or not Glasser would wish to proceed straight to the appellate court and render a judgment against Glasser or have the Court on its own motion order a new trial. Counsel for defendant returned with a letter to the Court re-urging his opinion as to the fraud issue and that this Court should either find that the jury did not find Glasser liable, or in the alternative, find that such evidence did not support such a finding. The Provostys upon receiving this letter objected to its submission stating that it was an improper ex parte communication. The Court is of the opinion that defense counsel’s letter in response to this Court’s question was not an ex parte [sic] communication considering the fact that this Court asked for such a communication (in open court) in an attempt to avoid the unnecessary costs of a new trial as to only Glasser. The letter was sent to all counsel as appropriate. However, this Court will not consider the letter as a basis for its ruling since it has been objected to by the Provostys. Instead, this Court 11fiwill only consider the multitude of arguments already submitted by counsel *35 as well as its own efforts to determine how to fix this problem.

No Evidence Presented that Would Pierce the Corporate Veil

To determine whether the corporate veil should be pierced, the Jury is to consider five non-exclusive factors. The Louisiana Supreme Court in Riggins v. Dixie Shoring Co., Inc., 590 So.2d 1164 (La.1991) stated the following concerning the piercing of the corporate veil:
Some of the factors courts consider when determining whether to apply the alter ego doctrine include, but are not limited to: 1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings.
The fact that one individual owns a majority of stock in the corporation does not in itself make that individual liable for corporate debts. This is particularly true in the case of a closely held corporation where often corporate business is conducted by the majority, or sole, stockholder.

Louisiana courts are reluctant to hold a shareholder, officer, or director of a corporation personally liable for corporate obligations, in the absence of fraud, malfeasance, or criminal wrongdoing. Generally, unless the directors or officers of a corporation purport to bind themselves individually, they do not incur personal liability for debts of the corporation. Furthermore, corporate agents are generally not liable for corporate debts and the burden of establishing the contrary is on the corporate creditor.

1 yjWhen a party seeks to pierce the corporate veil, the totality of the circumstances is determinative. In order [sic] properly to [sic] disregard the corporate entity, one of the primary components which justifies piercing the veil is often present: to prevent the use of the corporate form in the defrauding of creditors. (Emphasis in original).
Riggins at 1168-69. This does not mean, however, that fraud must be asserted in order to pierce the veil. Majestic Floor Coverings, Inc. v. Lawson, 424 So.2d 504 (La.App. 5 Cir.1982) (The corporate veil can be pierced when a shareholder practices fraud upon a third person through the corporation or disregards the corporate entity to such an extent that the individualities of the corporation and the shareholder cease to exist.); McLean v. Smith, 593 So.2d 422 (La.App. 1 Cir.1991) (Under doctrine of “piercing the corporate veil” shareholder may be liable for debts of corporation because of failure of shareholder to substantially comply with legal requirements of corporate entity; doctrine may be imposed even in absence of fraud where there has been disregard of corporate entity to such extent that corporation is indistinguishable from shareholders).
There was no doubt that the jury found that Glasser did not perpetrate fraud upon the Provostys. Therefore, the question is whether the jury, under any of the five factors (or some other factor not enumerated), found that the corporate veil should be pierced as to allow the Provostys to go after Glasser personally under alter ego theory. No evidence whatsoever was presented that would invoke Factors 1, 2, 4 and 5. Plaintiffs’ entire case for piercing *36 the corporate veil comes under Factor 3 — undercapitalization. (Emphasis added).
The jury found that the veil should be disregarded in regards to ARC-LA (Question # 15 on the Jury Interrogatory Form). Therefore, the jury had to have found that either ARC-LA was undercapitalized or some other non-enumerated factor existed. Based upon the evidence presented, the Jury could not have found that Glasser undercapitalized ARC-LA or that another non-enumerated factor existed as to Glasser. Any such finding would be contrary to the law and evidence for the following reasons.
_Ll«*
In the matter at hand, absolutely no evidence was presented as to what amount of capital would be needed to start up a business such as ARC-LA. Furthermore, there was “no evidence that Glasser was deliberately keeping ARC-LA undercapitalized or depleting its assets.” The closest evidence that was produced of any involvement from Glasser was a call to Tiffany Street concerning his limit on his American Express Card. This does not, in the totality of the circumstances, show undercapital-ization. There is no doubt in this Court’s mind that the jury found that Christopher Schmitt, Jamey Schmitt, Richard Drevet, Matt LaMora, and Ice-House Capital, LLC through its Managing Member Marc Winthrop were heavily involved in ARC-LA’s shell game and in defrauding their customers and that this alone warrants the piercing of the corporate veil. But based upon the initial investment of $500,000 by the New York members, no evidence that Glasser deliberately took money from ARC-LA, and no evidence introduced concerning what initial capital would be required to start up ARC-LA, there is no way reasonable minds from the Jury could have determined that Glasser undercapital-ized ARC-LA.
As to non-exclusive factors that the Jury could have found from the testimony, “only exceptional circumstances warrant disregarding the concept of &■ corporation as a separate entity.” Fina Oil & Chem. Co. v. Amoco Prod. Co., 673 So.2d 668, 673 (La.App. 1 Cir.1996), writ denied, 679 So.2d 1353 (La.9/27/96), citing Riggins, 590 So.2d at 1168. Once again, the only testimony linking Glasser to any activities conducted by ARC-LA was a telephone call from Glasser to Tiffany Street regarding the expense limit on his American Express Card. It is not an exceptional circumstance for someone invested in a company to ask why his credit card has been declined. This Court is of the opinion that no exceptional circumstances exist to pierce the corporate veil that the Jury would have followed. Any opinion otherwise would be clearly contrary to the law and evidence adduced at trial and would warrant a Judgment Not Withstanding the Verdict.

Did Glasser have knowledge of the Fraud?

119“Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may result from silence or inaction.” La. C.C. Art.1953. “Error induced by fraud need not concern the cause of the obligation to vitiate consent, but must concern a circumstance that has substantially influenced that consent.” La. C.C. Art.1955. In essence, the Provost-ys’ major claim was that Glasser himself made some type of misrepresentation or *37 suppressed some type of truth to the Provostys. However, after its reading of Bossier Millwork and Supply Co. v. D & R Constr. Co., 245 So.2d 414, 417 (La.App. 2 Cir.1971) submitted by the plaintiffs, this Court once again concludes that a plaintiff is allowed a separate cause of action against an individual shareholder who knows of the fraud and has both equal decision-making power and participation in the business — even if that shareholder did not have any interactions with the plaintiff whatsoever that gives rise to a vitiation of the contract.
Bossier involved a set of facts where the defendant construction company entered into a contract to sell property it owned to a buyer. In order for the buyer to procure a loan, the defendant seller was required to show that there were no liens on the property. One of the defendant company’s two majority owners, Roberts “signed a lien affidavit making an oath to the effect that all charges and costs for labor performed, material furnished and fixtures installed on the premises were paid for in full and that the premises was free and clear of all claims which would give rise to a lien.” Once the sale went through, several liens were filed against the property. The Title Insurance Company which made the loan intervened in the suit and the appellate court ruled that the corporate veil could be disregarded as to the other majority owner, Duncan, even though he never signed the affidavit. In its reasons, the Second Circuit in addition to finding that the corporation did not follow several of the corporate formalities required to give protection to the individual shareholders from personal liability, found that:
Although Roberts alone signed the affidavit on behalf of the corporation, it is admitted by Duncan that he participated in the management of the financial affairs of the business. He testified that at the end of each |gnmonth he reviewed with Roberts the accounts owing by the business, and checks were issued in payment of bills at that time. He further admitted he knew the loan was scheduled for closing and that all of the bills for materials and labor on this residence had not been paid. He also admits going with Roberts to the attorney’s office to receive the check for the net proceeds of the loan, and participating in the distribution of the funds without disclosing to the attorney that bills were outstanding on the house. Bossier at 416. (Emphasis in original)
Furthermore:
... The facts as we understand them lead to the conclusion that Duncan had equal authority and participation in the management of the financial affairs of their venture and knew that the sale and mortgage transaction would be consummated at the appointed time. With his knowledge of the circumstances of the financial plight of the construction project, he was under an equal duty with Roberts to advise the attorney who represented American Title Insurance that all bills had not been paid. . The willful action of Duncan in participating in the receipt and distribution of funds derived from the transaction renders him equally guilty of the deceit practiced on third party plaintiff. Having done so, Duncan may not use the corporate entity as a shield from personal responsibility. Bossier at 417. (Emphasis in original)
The rationale in Bossier is clear — a shareholder in a business cannot escape *38 personal liability from fraud by knowingly benefiting from the fraudulent actions of other members of the business. The question that should have been provided on the jury interrogatory form is whether or not Glasser:
A) Had knowledge of the fraud perpetrated by members of ARC-LA;
B) Equally participated in the financial business of ARC-LA; and
| ⅞, C) Had equal authority in the financial business to have done something about it[J
However, this Court after hearing the evidence is sure of one thing — if the Jury had come in with a verdict finding that Glasser satisfied these three criteria, a judgment not withstanding the verdict would be warranted as to this issue. As previously stated, Glasser was over a thousand miles away, and other than the one phone call from Glasser to Street concerning his American Express Card, not a shred of evidence was elicited that showed any participation in the business or knowledge of what was going on. While the plaintiffs introduced several emails into evidence, none of this communication shows anything past the fact that ARC-LA was struggling financially. These communications would not inform anyone thousands of miles away that the local members of ARC-LA were fraudulently misappropriating money to other jobs or themselves. This Court indeed struggled with whether or not a decision concerning Glasser should even be allowed to go to the jury. This Court indulged the plaintiffs’ wishes in this regard, which resulted in a finding that Glasser did not perpetrate any fraud nor was he liable for any violation of LUTPA. It is clear to this Court that the jury would have found that Glasser had no knowledge of the fraud and did not participate in the management of the financial affairs of ARC-LA if it were presented with the issue. (Emphasis added).
Originally, this Court was under the mindset that it would rule on its own motion that a new trial would be required as to the limited issue of whether Glasser knew of the fraud committed by the members of ARC-LA. However, after its analysis of the issue, to require that a jury be selected to render an improbable verdict that would be clearly contrary to the evidence adduced at trial would be a waste of the judicial efficiency of this Court.
Upon a de novo review of the record, we find that the trial court properly entered a judgment of dismissal in favor of Mr. Glas-ser. Not only did the jury find that Mr. Glasser did not commit fraud, but the evidence in the record does not support piercing the veil as to Mr. Glasser under the Riggins case. Accordingly, we affirm that part of the judgment dismissing Mr. Glas-ser with prejudice.
laplssue Two: Future Damages
Plaintiffs argue on appeal that the trial court erred in denying their motion to amend the scheduling order to allow C. Spencer Smith, the architect who designed their house, to testify as an expert. Further, Plaintiffs argue that the trial court erred when it instructed the jury that it could not award them future damages. We find no merit in Plaintiffs’ arguments.
Plaintiffs filed this lawsuit on April 3, 2008. The trial court imposed a deadline for disclosing witnesses of October 15, 2010. Trial was scheduled, and commenced, on January 31, 2011. On December 16, 2010, six weeks before trial, Plaintiffs filed an “Ex Parte Motion for Leave to File an Amended Witness List” in which they sought to add an expert witness to *39 testify to the “cost to rectify construction defects.” The trial court denied Plaintiffs’ motion based on La. C.C.P. article 1425(F), for Plaintiffs failure to timely list the expert. La. C.C.P. article 1425(F) provides that “a motion for a pretrial hearing to determine whether a witness qualifies as an expert or whether the methodologies employed by such witness are reliable ... shall be filed not later than sixty days prior to trial.” At the hearing regarding the jury charges, the trial court stated as follows:
Plaintiffs contend that this Court should allow future damages to go to the jury despite the fact that they themselves had no experts for trial. Plaintiffs are attempting once again to re-urge this Court’s ruling concerning a motion in limine through a jury instruction. Plaintiffs contend that Dodie Smith is an expert; and even if she is not considered an expert, her testimony allows for future damages to go before the jury since she was able to articulate that what was done was not in accordance with the plans provided by the Louisiana Code of Civil Procedure, Article 1425F which was amended in 2008.
... Plaintiffs state that some may allow for the Provostys to pre-qualify their expert and that it is not | ^required. This is a total misapplication of the Code, Articles of Civil Procedure, Article 1425. This article requires that an expert be challenged with the 60/30-day limit prior to trial. And if this Court were to allow the Provostys to add Dodie Smith as an expert, the defendants would be stripped of their statutory right to challenge within the time periods provided. Therefore, Do-die Smith cannot be considered an expert.
Plaintiffs further state the issue is not that the Provostys are required to replace all floors or remove and raise the roof, but rather it would cause the Pro-vostys to match the plan, which Leake testified was what the contract required. However, evidence regarding change orders were [sic] presented by Matt La-Mora, which this Court deemed as an expert. His testimony regarding the change orders specifically requires that the Provostys put forth expert testimony regarding whether the work was necessary and the expenses reasonable under Ollis versus Miller, 886 So.2d 1199 [ (La.App. 2 Cir.2004) ]. The Provostys have not provided such testimony; and, as such future expenses are denied.
Under La. C.C.P. article 1425(F), we find the trial court was within its discretion in denying the motion to amend the witness list to have Ms. Smith testify as an expert within six weeks of trial. Further, in order to recover future damages, the plaintiff must prove by a preponderance of evidence that he is reasonably certain to incur such damage. Mere possibility is not sufficient. See Coon v. Placid Oil Co., 493 So.2d 1236, 1240 (La.App. 3 Cir.1986). In this matter, the trial court awarded the Provostys $213,984.16 for out of pocket costs and expenses for construction of the house, as well as $25,000.00 for additional rental, insurance, transportation and inconvenience costs. After reviewing the record, we too find that the Plaintiffs failed to put on sufficient expert testimony regarding whether the work was necessary and the expenses reasonable to award future damages. Accordingly, we find no error in the trial court’s ruling to deny ^Plaintiffs’ motion to amend the witness list as well as denying the jury charge of future damages.
Issue Three: Attorney’s Fees, Costs, and *40 Sanctions[8]
The third issue to consider is whether the trial court erred by not granting Plaintiffs all of their attorney’s fees and costs to bring the case through trial and whether the trial court erred in denying Plaintiffs’ motion to sanction defendants. After the trial, on February 23, 2011, Plaintiffs filed a motion for attorney’s fees and costs totaling $433,872.73. After a hearing on April 28, 2011, the trial court awarded Plaintiffs $314,014.56 in attorney’s fees, costs, and expenses. In its reasons for judgment, the trial court addressed the relevant factors[9] in considering the reasonableness of the award under Rivet v. State Dept. of Transp. & Development, 96-145, pp. 11-12 (La.9/5/96), 680 So.2d 1154, 1161-1162, and provided extensive-reasons for not awarding the Plaintiffs the full amount they were requesting. Specifically, the trial court stated, in pertinent part:
While there is no doubt that Plaintiffs’ counsel put a lot of work into this case, much of the work in the later part of 2010 and into 2011 is a red herring. Plaintiffs’ reasoning for such an exorbitant figure of costs and attorney fees stems from the e-discovery motions filed by plaintiffs alleging that documents and materials were not properly turned over by the defendants. However, this Court, after several motion hearings has come to two conclusions.
First, the plaintiffs’ experts lack any sort of credibility. What was truly telling to the Court in this regard was that the plaintiffs’ experts’ search originally |2;¡came up with thousands of emails that plaintiffs argued should be turned over. There is absolutely no way that ARC-LA would be able to generate the amount of emails that were originally requested unless it hired an army of staff to email only on the Provosty project. Further telling was the testimony given by Louis Delong concerning the ARC-LA and ARC-MO hard drives. The hard drives were turned over to the Provostys voluntarily, and yet Delong only searched the files for a particular format. When questioned about this, Delong stated that he did not know that the files were kept in a different format. Defense counsel hit the nail on the head when questioning Delong’s expertise in that it was the expert’s job to find the information on the hard drive — not for defense counsel to tell Delong and the other experts how to search the drives....
Second, the plaintiffs, despite obtaining a “treasure trove” of documents according to the plaintiffs, have not pointed to a single document used at trial or a document that would be reasonably calculated to lead to admissible evidence that was not already turned over to the plaintiffs. To be frank, this Court finds that plaintiffs’ counsel greatly abused the requests of e-discovery, always wanting more when such results simply did not exist.
*41 The amount awarded in attorney fees is left to the discretion of the trial court and should not be disturbed absent an abuse of that discretion. See Corbello v. Iowa Production, 02-826, pp. 35-36 (La.2/25/03), 850 So.2d 686, 710, (affirming a four million dollar award in attorney fees.)
The trial court’s reasons for judgment provide this Court with great guidance as to why it awarded the attorney fees and costs that it did. Although Plaintiffs argue on appeal that the trial court only examined their billing in arriving at its decision, and that the trial court failed to properly apply the Rivet factors, we do not find this to be the case. We further find no merit to Plaintiffs’ argument that the trial court originally sanctioned them by reducing their attorney’s fees as the judgment itself fails to mention the word “sanction” in it. Although the attorney’s 126fees portion of the written reasons was titled “Attorneys Fees for the Prevailing Party and Sanctions Imposed under La. C.C.P. art. 1471,” reasons for judgment are not part of the official judgment which the trial judge signs or from which appeals are taken. See La. C.C.P. art.1918; Parish of St. Charles v. Young, 99-411, p. 3 (La.App. 5 Cir. 12/15/99), 750 So.2d 276, 278. After reviewing the evidence, we do not find that the trial court abused her great discretion in awarding Plaintiffs $314,014.56 in attorney’s fees and costs.
Further, although Plaintiffs and defendants, Icehouse and Mr. Glasser, argue on appeal that they were entitled to sanctions, we find no merit in these assignments of error. La. C.C.P. art. 863 is intended only for exceptional circumstances and is not to be used simply because parties disagree as to the correct resolution of a legal matter. See Fairchild v. Fairchild, 580 So.2d 513, 516-517 (La.App. 4 Cir.1991). On appellate review, a trial court’s finding as to a sanctionable violation of LA. C.C.P. art. 863 may not be disturbed unless the record furnishes no evidence to support the finding, or the finding is clearly wrong. Id.
After a hearing on the issue of sanctions, the trial court declined to sanction either party. Specifically, the trial court stated in her judgment,
... after listening to all testimony, and considering both the credibility and competence of all the witnesses, the court finds that there were several misunderstandings between both sides as well as behavior that certainly could have been more professional (but possibly resulted from “culture shock”). None of the misunderstandings or poor behavior rise to the sanctionable level, however.
We have reviewed the entire record in this matter, and we do not find the conduct of the parties to be sanctionable. Accordingly, we do not find that the trial court’s decision to deny sanctions to either side was clearly wrong.
| tissue Four: The Emotional and Mental Anguish Award
The Plaintiffs argue on appeal that the trial court erred by granting Icehouse’s JNOV and vacating the jury’s award of $300,000.00 for emotional and mental anguish and instead award them $10,000.00 each. Icehouse, the only defendant that filed a motion to amend the judgment, for a judgment notwithstanding the verdict and/or new trial, argued to the trial court that Plaintiffs failed to prove the existence of a “significant non-peeuniary interest” and that Icehouse knew or should have known that its failure to perform would cause non-pecuniary loss.
In order to grant a JNOV motion under La. C.C.P. art. 1811, a trial court applies a rigorous standard based upon the principle that when there is a jury, the jury is the *42 trier of fact. See Scott v. Hospital Service Dist. No. 1 of St. Charles Parish, 496 So.2d 270, 273-274 (La.1986). From this principle it follows that only “when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict” is a JNOV warranted. Joseph v. Broussard Rice Mill, Inc., 00-628, p. 4 (La.10/30/00), 772 So.2d 94, 99. It is not sufficient that there be a preponderance of evidence in favor of the mover. Id. The more rigorous standard is that “reasonable persons could not reach different conclusions ...” Id. In ruling on the JNOV motion, a trial court may not weigh or evaluate the credibility of witnesses. See Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991). A trial court must resolve all reasonable inferences or factual questions in favor of the non-moving party. Id.
1 asWe, as an appellate court, review the granting or denying of a JNOV de novo. Elfers v. AIG Nat. Ins. Co., Inc., 11-0596, p. 4 (La.App. 4 Cir. 11/16/11), 80 So.3d 585, 587. We use the same criteria, without any deference to the trial court’s decision, to ask ourselves the question, “do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict?” Joseph, 00-0628, p. 5, 772 So.2d at 99. If our answer is in the affirmative, then we will conclude that a JNOV should have been rendered; if negative, then the motion should have been denied. Id.
Plaintiffs argue that the evidence and testimony introduced at trial shows that the JNOV on this issue should not have been granted. Specifically, Plaintiffs argue that the jury found that the contract at issue was to satisfy the nonpecuniary interest of them and that the jury heard testimony of six witnesses (including themselves) who had direct and specific knowledge of their history leading up to the construction of their “dream home,” the loss of their previous home in Hurricane Katrina, the design, construction, management, and funding of their dream home, and the multitude of problems and delays in the construction project, which spanned over 17 excruciating months.
Tiffany Curry, a sales manager for ARC-LA in 2006, testified that when the Plaintiffs signed the contract with ARC-LA in December 2006, the company was not licensed to do construction work. Ms. Curry testified that the Plaintiffs’ first deposit of $136,000.00 went to paying the “American Express bill, the Home Depot card, other people that we owed money to that we were behind on like contractors and subcontractors.” Despite the fact that it took until April 2007 to just pour the concrete for the Plaintiffs’ house, Ms. Curry testified that she was continually pressured by management to get more money from the Plaintiffs. 1 MWhen asked why she flew from Chicago, Illinois to testify for the Plaintiffs, Ms. Curry stated “[b]e-cause they [Plaintiffs] didn’t do anything wrong, and they’ve been victimized in this situation, and I felt like if there’s anything that I can — you know, that if there’s a way that I’m able to, by telling the truth, help justice be served, then I want to.”
Erin Grunberg, the bookkeeper for ARC-LA in May of 2006-April 2007, testified that she “knew that the Provosty project was pretty much impossible to get it done because we (ARC-LA) couldn’t afford to pay for the supplies or the subcontractors.” When asked how ARC-LA was going to find the money to replace Plaintiffs’ first deposit, Ms. Grunberg responded, “[i]t wasn’t happening. Somebody was eventually going to get — their money *43 would be gone, and they would have nothing for it.”
Penny Weeks, the project manager for Baseline Construction, testified about the first time he met the Plaintiffs to discuss their house. Mr. Weeks testified, as follows:
I can remember when I met them [the Plaintiffs], they were just totally stressed out and overwhelmed with everything they had been through on the project. They told me their experience had just been a total nightmare.
And they shared with me that the original contractor had been paid up front for the job, and he basically left and didn’t finish the job. And they were having issues with subcontractors not wanting to come back and finish the job. They were out of money. And there was still a lot to be done. And they just needed Baseline to get them in their home as fast as possible.
Mr. Weeks further testified that even though the house was eventually finished, he believed the house had issues and that he would not have wanted it to be his home. Specifically, he testified that the wall “seemed bowed and didn’t join properly and Ispnails were popping though” and that the house “just didn’t look at [sic] nice as it should have looked.”
Gloria Provosty testified that she paid ARC-LA $414,393.00 to build their dream house after losing everything in Hurricane Katrina. She testified that the experience with ARC-LA had caused her husband to be a nervous wreck and that “[h]e doesn’t sleep at night, hasn’t slept for months, I mean, for years because of the financial strain ... [fit’s just been a total nightmare that started way back and still has not ended yet.” She testified to all of the promises ARC-LA made to them regarding the building of their dream house and the constant disappointment of having little done. She testified that the children have had a difficult time throughout the six years hearing about the problems associated with the house and that her husband is an emotional wreck and “a different person than I married.”
Henry Provosty testified that even after paying ARC-LA over $400,000.00, there was not much happening with the house over the summer of 2007. He testified that “the windows that were supposed to have been ordered were not ordered, and the house sat with all the windows open, no doors, nothing but framing from about probably the end of May through October” and that this caused damage to the sub-floor and other parts of the house. Mr. Provosty testified that working with ARC-LA was “very, very difficult” and financially devastating.
The jury verdict found that the nature of the construction contract was to satisfy the Plaintiffs’ emotional interest to build their dream home. When asked on the jury verdict “what amount of emotional and mental anguish damages did the Provostys suffer due to the Defendants breach of contract, fraud, bad faith, and misappropriation, by failing to provide their dream home,” the jury responded with $300,000.00. Because this Court must resolve all reasonable inferences or factual | ^questions in favor of the non-moving party, and because the jury verdict is in fact supported by competent evidence, we find it was error for the trial court to grant a JNOV under these facts. Accordingly, we reverse that part of the judgment that granted Icehouse’s motion for JNOV and we hereby reinstate the jury’s award of $300,000.00 for Plaintiffs’ emotional and mental anguish.
Issue Five: The Liability of Kestenbaum Associates
The fifth issue on appeal is whether the trial court erred in granting a di *44 rected verdict in favor of Kestenbaum. Plaintiffs argue that the jury held all the members of ARC-LA liable, thus Kestenb-aum should be held liable in solido with the other members of ARC-LA for the entirety of the judgment. On the other hand, Kestenbaum alleges on appeal that the Plaintiffs failed to introduce into evidence any documents showing its involvement with ARC-LA or with the Provostys, other than the ARC-LA articles of organization and other documents memorializing his 9.165% interest in ARC-LA.
A trial judge has much discretion in determining whether or not to grant a motion for directed verdict. Lott v. Lebon, 96-1328, p. 4 (La.App. 4 Cir. 1/15/97), 687 So.2d 612, 615. The question to be asked by the court is not whether mover proved its case by a preponderance of the evidence, but rather, upon reviewing the evidence submitted, the court could conclude that reasonable persons could not have reached a verdict in favor of the mover’s opponent. Descant v. Administrators of Tulane Educ. Fund, 95-2127, p. 14 (La.App. 4 Cir. 1/21/98), 706 So.2d 618, 627. It is generally appropriate for a trial court to grant a motion for directed verdict in a jury trial when, after considering all evi-dentiary inferences in the light most favorable to the movant’s opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men [^could not arrive at a contrary verdict. If there is substantial evidence presented in opposition to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. Id. On appeal, the standard of review for legal sufficiency of the evidence challenges (a question of law), such as those presented by motions for directed verdicts, is de novo. Hall v. Folger Coffee Co., 2003-1734, p. 10 (La.4/14/04), 874 So.2d 90, 99.
After a de novo review of the record, we find that the trial court properly granted a directed verdict in favor of Kestenbaum. Plaintiffs testified at trial that they neither knew Mr. Kestenbaum (Kestenbaum Associates) nor had ever received any communication of any kind from him. The record is also devoid of any evidence that (1) Kestenbaum perpetrated or was aware of any fraud against the Plaintiffs, (2) Kes-tenbaum was involved in the operations and administration of ARC-LA, and (3) Kestenbaum knew of or was responsible for the alleged undercapitalization. Upon reviewing the evidence submitted, we find that the trial court properly concluded that reasonable minds could not have reached a verdict in favor of Plaintiffs and against Kestenbaum.
Defendants Answer to Plaintiffs’ Appeal
Mr. Glasser and Kestenbaum filed answers to Plaintiffs’ motion for appeal arguing that the corporate veil of ACR-LA should not have been pierced. However, because we have already found that the trial court properly entered a judgment of dismissal in favor of Mr. Glasser, and it properly granted a directed verdict in favor of Kestenbaum, this issue is moot. Further, because the trial court has granted Icehouse a new trial, and because neither the Plaintiffs nor defendants | ¡¡shave raised an assignment of error in this regard, we pretermit any discussion of assignments of error alleged by Icehouse.
Accordingly, we hereby reverse that part of the judgment which reduced Plaintiffs’ emotional and mental anguish award from $300,000.00 to $10,000.00 each. We reinstate the jury’s award of $300,000.00 for emotional and mental anguish, and we affirm the judgment of the trial court in all other respects.
*45 AFFIRMED IN PART; REVERSED IN PART
TOBIAS, J., concurs and assigns reasons.

. The New York defendants were not parties to the contract.

. Although Plaintiffs acknowledge that the trial court granted a directed verdict in favor of defendant Kestenbaum, they allege on appeal that an objection was made to this ruling. However, upon reviewing the record, we find no objection was made by Plaintiffs during the trial court’s oral ruling.

. Plaintiffs’ proposed judgment is not in the record. However, Plaintiffs’ memorandum in support of their proposed judgment as well as the New York Defendants’ memorandum in opposition to Plaintiffs’ proposed judgment are in the record.

. Mr. Marx’s letter is not in the record; however, both Plaintiffs and defendants acknowledge that the letter was sent to the Court. Mr. Marx, counsel for the New York defendants, alleges in his appellate brief that a copy of the letter was sent to all counsel. The trial court, in its reasons for judgment on June 23, 2011, also states that the letter was sent to all counsel and that the communication was not ex pane.

. Although the trial court did not find that Mr. Marx’s letter in response to the Court’s issue regarding Mr. Glasser’s liability was an ex parte communication, it nonetheless did not consider the letter as "a basis for its ruling since it has been objected to by the Provostys.” Instead, the trial court only "considered the multitude of arguments submitted by counsel as well as its own efforts to determine how to fix this problem.”

. The hearing could not be completed on October 6, 2011, and resumed on November 9, 2011.

. On April 4, 2012, Icehouse filed an unopposed motion to amend this judgment to delete references to Icehouse Capital Management, LLC “through its managing member, Marc Winthrop." On April 5, 2012, the trial court signed an amended judgment deleting "through its managing member, Marc Winthrop”. Thus, as of April 5, 2012, the correct *30 party name is “Icehouse Capital Management, LLC.”

. The New York defendants are not appealing the $314,014.56 award for Plaintiffs' attorney's fees and costs; however, defendants Icehouse and Mr. Glasser, as well as Plaintiffs, appeal the trial court's judgment, which declined to award sanctions.

. According to Rivet, the relevant factors include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) the amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge, attainment, and skill of the attorneys; (7) the number of appearances involved; (8) the intricacies of the facts involved; (9) the diligence and skill of counsel; and (10) the court’s own knowledge. Rivet, 96-145, pp. 11-12, 680 So.2d at 1161.